**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

| | | |
|---|---|---|
| **RAMONA CHARMEL HILLMAN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 05-2052-STA-tmp** |
| | ) | |
| **SHELBY COUNTY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

---

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendant's Motion for Summary Judgment (D.E. # 141), filed on July 20, 2011. Plaintiff filed a Response (D.E. # 146) on September 16, 2011. Defendant filed a Reply (D.E. # 160) on October 7, 2011. For the following reasons, Defendant's Motion is **GRANTED**.

### BACKGROUND

This case arises from Plaintiff's alleged wrongful termination from the Shelby County Department of Corrections ("SCDC"). Plaintiff worked as a correctional officer at the SCDC from 1998 until 2004. (Def.'s Statement of Facts, D.E. # 141-2, at 1.) On February 1, 2002, Plaintiff filed a charge of sex discrimination in the form of a "sexually hostile work environment from male inmates exposing themselves since 1991." (D.E. # 141-6, at 42.) She amended her EEOC charge on February 4, 2002, to allege that the inmate exposure had begun on January 25, 2002, and that she had reported the behavior to management, who did not take corrective action.

1

(*Id.* at 43.) On March 25, 2002, Plaintiff filed her third EEOC charge, alleging that the inmate exposure took place from March of 2001 through December 31, 2001. (*Id.* at 44.) The EEOC issued its Dismissal and Notice of Rights on May 29, 2002. (*Id.* at 45.) On June 18, 2002, a group of female correctional officers, including Plaintiff, filed suit against the SCDC before the EEOC and the Western District of Tennessee ("the 2002 Lawsuit") alleging a hostile work environment claim in violation of Title VII. (Def.'s Statement of Facts, D.E. # 141-2, at 11.) Three of the 2002 Lawsuit plaintiffs were promoted to sergeant on October 1, 2003. (Def.'s Statement of Facts, D.E. # 141-2, at 11.)

On February 4, 2004, the Municipal Court of Southaven, Mississippi, issued a warrant for Plaintiff on the charges of "Assault, Physical Fear." (Def.'s Statement of Facts, D.E. # 141-2, at 1.) Five days later, on February 9, 2004, Plaintiff was arrested and notified Anthony Alexander, the SCDC Chief of Security ("Chief Alexander"), of her arrest. (*Id.* at 2.) The next day, February 10, 2004, Lieutenant Edgar Hampton ("Lt. Hampton") notified Plaintiff that the SCDC would be conducting an internal investigation to determine whether she had violated any policies. (*Id.*) On May 5, 2004, Plaintiff was found guilty by the Mississippi Municipal Court of "Assault, Physical Fear" in violation of Miss. Code Ann. § 97-3-7(1)(c). (*Id.* at 1-2.; Dep. of Hillman, D.E. # 79, at 40-41, 43.)

On May 28, 2004, Lieutenant Stephanie Sumlar ("Lt. Sumlar") issued Plaintiff a Notice of Proposed Major Discipline ("*Loudermill* Notice")[1] for violating SCDC Policies and

---

[1]     A *Loudermill* notice, named after *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985), forms part of the procedural due process rights held by public employees in their property right to continued employment. Under *Loudermill*, a public employee must be given notice and an opportunity to be heard before he or she is terminated; the absence of either violates the employee's due process rights.

Procedures, Standards of Conduct, General Post Orders, the Memorandum of Understanding between the SCDC and the correctional officers' union, and the Shelby County Employee Handbook. ((Def.'s Statement of Facts, D.E. # 141-2, at 3.) On June 8, 2004, Lt. Hampton conducted a *Loudermill* hearing based on the contents of the *Loudermill* Notice. (*Id.* at 10.) Three days later, on June 11, 2004, Lt. Hampton issued his findings and decision to terminate Hillman. (*Id.*) Thus, Plaintiff was terminated on June 11, 2004. (Dep. of Hillman, D.E. # 79, at 27.)

Plaintiff initially filed a complaint with the EEOC regarding her termination on June 11, 2004, and she amended that complaint on August 17, 2004. (Dep. of Hillman, D.E. # 79, at 36.) The EEOC charge related to retaliation for filing the 2002 Lawsuit. (D.E. # 141-6, at 50.) Plaintiff's termination was affirmed at her civil service board hearing on August 26, 2004. (Dep. of Hillman, D.E. # 79, at 37.) Plaintiff does not believe that the civil service board affirmed her termination in retaliation for the 2002 Lawsuit. (*Id.* at 66.) The EEOC issued Plaintiff's right to sue letter on October 29, 2004. (*Id.* at 38.)

Plaintiff then filed her original pro se Complaint on January 24, 2005. (D.E. # 1.) At some point in 2005, Plaintiff obtained counsel. (*See* Order Denying Mot. to Dismiss, D.E. # 30, at 3.) Plaintiff amended her Complaint three times, culminating in the filing of her Third Amended Complaint on February 13, 2006. (D.E. # 43.) In her Third Amended Complaint, Plaintiff alleged claims of retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII") and retaliation and gender discrimination claims under the Tennessee Human Rights Act ("THRA"). (Third Am. Compl. ¶ 1.)

Discovery continued until August 30, 2007, when United States District Judge Daniel Breen continued the trial and ordered the parties to file supplemental briefing on whether Plaintiff had exhausted her administrative remedies. (D.E. # 81.) Defendant failed to follow Judge Breen's instructions and instead filed a brief on issue preclusion. (D.E. # 83.) Plaintiff complied with Judge Breen's directions and filed a brief on exhaustion of remedies. (D.E. # 82.) After Judge Breen ordered the parties to respond to the legal arguments before the Court (D.E. # 86), the parties did so, and Judge Breen dismissed the case on the basis of issue preclusion. (D.E. # 97.) The Sixth Circuit reversed (D.E. # 101) on October 16, 2008, and the case was transferred to this Court on November 12, 2008. (D.E. # 103.) Trial was continued twice before Defendant filed the Motion for Summary Judgment now before the Court. (D.E. # 130, 137.)

Ordinarily, the Court would lay out the evidence before it as presented by the parties in their Statements of Undisputed Fact. However, the parties' Statements of Undisputed Fact primarily address Plaintiff's disciplinary history and whether Lt. Sumlar and Lt. Hampton properly relied on certain documents when respectively compiling the *Loudermill* Notice (Lt. Sumlar) and determining whether to terminate Plaintiff (Lt. Hampton). However, the Court feels that the contents of Plaintiff's *Loudermill* Notice and adherence to or divergence from Defendant's policies regarding the composition and maintenance of its employees disciplinary files speak more to the issue of pretext rather than the development of Plaintiff's prima facie case. As such, the Court will lay out the facts as indicated by the deposition testimony of Plaintiff, Lt. Sumlar, and Lt. Hampton.

Lt. Sumlar was deposed on March 6, 2007. (Dep. of Lt. Sumlar, D.E. # 148-3, at 1.)[2] She worked for the SCDC as an operations lieutenant in the operations department, often performing investigations of discipline. (*Id.* at 3.) Her former immediate supervisor was Chief Alexander. (*Id.*) She did not remember speaking with Chief Alexander about Plaintiff's *Loudermill* charges, nor does she think it is possible that she spoke with him. (*Id.* at 4.) Lt. Sumlar never had a dispute with Plaintiff while they were both correctional officers. (*Id.* at 6.) Lt. Sumlar indirectly supervised Plaintiff from 1997 until 2004, but she could not recall having any problems with her. (*Id.* at 7.) Nor could she recall getting into an argument with Plaintiff or Plaintiff refusing to follow her orders. (*Id.*)

Lt. Hampton was deposed on March 5, 2007. (Dep. of Lt. Hampton, D.E. # 148-1, at 1.) At that time, he had worked at the SCDC for over nineteen years. (*Id.* at 3.) As the administrative lieutenant in the Operations Department, Lt. Hampton conducted investigations, special assignments, inmate grievances and complaints, and employee complaints. (*Id.* at 4.) Lt. Hampton first met Plaintiff in 1991 or 1992, and he dealt with her specifically in three particular situations. (*Id.* at 5.) First, he knew about her parking illegally in the employee parking lot, and he had to go to her in his capacity as a supervisor and explain to her that she was "doing something outside of the ordinary." (*Id.*) Second, Lt. Hampton worked with Plaintiff to develop an altered work schedule, and third, he dealt with her *Loudermill* hearing and her eventual termination. (*Id.*) Lt. Hampton wrote Plaintiff up and gave her a memo for her illegal parking, but he did not recall whether he had written up other correctional officers for parking violations.

_____

[2] The Court will reference the ECF page numbers of the depositions of Lt. Hampton and Lt. Sumlar rather than the page numbers of their deposition testimony.

(*Id.* at 5-6.)  Additionally, Lt. Hampton did not write Plaintiff up for the altered work schedule; instead, he worked with her in that particular situation.  (*Id.*)  The third situation involved Plaintiff's *Loudermill* hearing and eventual termination.

Lt. Hampton described Plaintiff as a "controversial employee" based on her disciplinary record rather than his direct dealings with her, which were "very few."  (*Id.* at 7.)  Lt. Hampton referenced Plaintiff's arrest in 1996 as part of his basis for this opinion, but he did not know that the criminal charges underlying this arrest were ultimately dismissed and expunged.  (*Id.* at 7-8.)  Lt. Sumlar stated that Plaintiff always had a volatile state to her and "kind of an explosive temper," but she was a good person.  (Dep. of Lt. Sumlar, D.E. # 148-3, at 23.)

In her Affidavit, Plaintiff states that she made an internal complaint to Lieutenant Pugh and Director Specher about sexual harassment by Sergeant Melvin Brown ("Sgt. Brown") between 1996 and 1998.  (Aff. of Hillman, D.E. # 147, at 22, 31.)  Sgt. Brown was eventually terminated, and in January of 1998, Plaintiff received a letter confirming that Sgt. Brown had created a hostile work environment.  (*Id.* at 31.)  Plaintiff alleges that Defendant began constantly writing her up with disciplinary actions and memos in 1998 following Sgt. Brown's termination until she was ultimately terminated in 2004.  (*Id.* at 32.)  Plaintiff did not file a charge with the EEOC related to her 1996-1998 hostile work environment complaint.  Additionally, Plaintiff was arrested on February 12, 1996.  (*Id.* at 5.)  While Plaintiff was not subsequently convicted of this charge, she did not have a *Loudermill* Notice and hearing brought against her for the events underlying her arrest.

At the time of Plaintiff's termination in 2004, Lt. Hampton was involved with investigations, and he served as the *Loudermill* hearing officer in Plaintiff's case.  (Dep. of Lt.

Hampton, D.E. # 148-1, at 9.)  Lt. Hampton began conducting *Loudermill* hearings in 2003, and by 2007, he had conducted six or seven.  (*Id.* at 10.)  When conducting *Loudermill* hearings, Lt. Hampton listened to all of the evidence put forth by both sides and "ma[d]e some type of assessment as to whether . . . that person would be found guilty" or exonerated of the charges before them.  (*Id.* at 9.)  In Plaintiff's case, he served as the initial decision-maker, recommending that Plaintiff be terminated after Lt. Sumlar conducted an investigation.  (*Id.*)  Chief Alexander, who served as chief of security at the time, reviewed Lt. Hampton's decisions and issued final recommendations, and Lt. Hampton could not remember a time when Chief Alexander overturned him.  (*Id.* at 10.)

At Plaintiff's *Loudermill* hearing, Lt. Hampton noted that Plaintiff was charged with intentional failure to carry out instructions and willful disregard of lawful orders.  (*Id.* at 12.)  According to Lt. Hampton, Plaintiff did not conduct herself responsibly or in a professional manner, as she became "involved and entangled in . . . situations where threats, coercions, [or] other types of things were being levied with her involvement with Shirley Abrams [("Mrs. Abarms")]."[3]  (*Id.*)  Plaintiff's 2004 assault conviction resulted in the *Loudermill* Notice being put together.  (*Id.* at 33.)  Lt. Hampton felt that Plaintiff's dealings with the public—in this case, Mrs. Abrams—were not respectable and were not up to the standards preferred by the SCDC. (*Id.* at 13.)  Furthermore, the SCDC "frowns upon its employees doing things that would reflect negatively on the [SCDC]."  (*Id.*)  Lt. Hampton also noted that Plaintiff had violated the Memorandum of Understanding ("MOU") between Defendant and the correctional officers'

---

[3]     Plaintiff's 2004 arrest for assault stemmed from her interactions with Mrs. Abrams.

union for similar reasons: failure to get along with the public and be on good behavior both on and off duty. (*Id.*)

Later in his deposition, Lt. Hampton further reiterated the reasons behind his recommendation that Plaintiff should be terminated. (*Id.* at 26.) He recommended that Plaintiff be fired because she "had been found guilty of criminal charges, and those criminal charges, according to [the SCDC's] policies and procedures . . . , were directly a part of [her] intentional failure to carry out instructions [and] willful disregard of lawful orders." (*Id.*) She was also terminated based on her violation of SCDC policy as it relates to employees, general post orders, and dealing with her past disciplinary record. (*Id.* at 27.)

Lt. Hampton noted that if an SCDC employee gets arrested, their arrest violates SCDC policies. (*Id.* at 13.) However, whether each arrested employee should be terminated for that arrest "depend[s] upon the charges." (*Id.* at 14.) After Plaintiff's *Loudermill* hearing, he recommended to Chief Alexander that Plaintiff be terminated after Plaintiff had been found guilty of the assault charges. (*Id.*) He knew she had appealed her assault conviction, but he did not know about the results of her appeal at the time he made his decision.[4] (*Id.* at 14-15.) Later in his testimony, he reiterated his lack of knowledge: he did not know that Plaintiff's conviction had been reversed on appeal. (*Id.* at 27.)

### Lt. Hampton and Lt. Sumlar's Knowledge of the 2002 Lawsuit

Notably, Lt. Hampton did not know of the 2002 Lawsuit in November of 2003. (*Id.* at 16.) Nor did he know that Lt. Sumlar was a designated representative of the SCDC in the 2002

---

[4]     Plaintiff's 2004 assault conviction was ultimately dismissed and expunged from her record on October 12, 2004, after she was terminated on June 11, 2004. (Dep. of Lt. Hampton, D.E. # 148-1, at 27.)

Lawsuit.  (*Id.* at 17.)  Similarly, he did not know the number of incident reports that had been filed by female correctional officers related to indecent exposure by inmates.  (*Id.* at 19.)  Lt. Hampton did not know when he first learned of the 2002 Lawsuit, but it may have been as late as 2006.  (*Id.* at 17.)  Lt. Hampton did not recall Lt. Sumlar informing him that Plaintiff was a member of the 2002 Lawsuit.  (*Id.* at 21.)

At the time of her deposition in 2007, Lt. Sumlar did not know that Plaintiff's 2004 assault conviction had been expunged.  (Dep. of Lt. Sumlar, D.E. # 148-3, at 10.)  She stated that the SCDC does not normally suspend disciplinary action for matters arising out of an arrest and conviction until a "final court action" is determined, but she was uncertain how a final court action was defined.  (*Id.*)  Lt. Sumlar could not recall whether Plaintiff appealed her assault conviction.  (*Id.*)  Although Lt. Sumlar admitted that at least one major infraction in Plaintiff's *Loudermill* packet should not have been in the packet, it was not her duty to find out whether the *Loudermill* Notice and its underlying bases were accurate.  (*Id.* at 16.)

It is unclear when Lt. Sumlar learned of Plaintiff's involvement in the 2002 Lawsuit.  She did not prepare responses to the 2002 Lawsuit.  (*Id.* at 21.) She could not tell Plaintiff's counsel when she found out that Plaintiff was a plaintiff in the 2002 Lawsuit, but the only way she would have known was if Plaintiff attended a deposition. (*Id.* at 33.)  Lt. Sumlar eventually stated that she did not know Plaintiff was involved in the 2002 Lawsuit until she attended Plaintiff's deposition, but she did not recall whether that deposition was before or after Plaintiff's termination.  (*Id.*)

### *Loudermill* Procedures

At the time of Plaintiff's termination, only two individuals were performing investigations in operations: Lt. Hampton and Lt. Sumlar. (Dep. of Lt. Hampton, D.E. # 148-1, at 20.) They worked in the same office from 2003 until August of 2006. (*Id.* at 21.) Their desks were about seven or eight feet apart, separated by a partition with a glass partition upon which Lt. Sumlar had affixed photos of her family and pets. (Dep. of Lt. Sumlar, D.E. # 148-3, at 24.) If Lt. Sumlar stood up and looked around the corner, she could see Lt. Hampton's desk; otherwise, she could not see what he was working on. (*Id.* at 24-25.) Similarly, she could not tell when he was on the phone. (*Id.* at 25.) They began sharing the office in this way in October of 2003, and the division of space continued through Plaintiff's termination in June of 2004. (*Id.*)

Despite this physical separation, Lt. Sumlar and Lt. Hampton's office investigates complaints, prepares *Loudermill* notices, conducts *Loudermill* hearings, and makes termination or retention recommendations. (Dep. of Lt. Hampton, D.E. # 148-1, at 25.) Lt. Sumlar is the lead investigator of employee discipline. (Dep. of Lt. Sumlar, D.E. # 148-3, at 9.) They alternate their duties so that the same person does not do the investigation, put the *Loudermill* notice together, and hold the hearing. (*Id.*) Generally, if Lt. Sumlar performs the investigation, she will put the *Loudermill* packet together, and then Lt. Hampton will hold the *Loudermill* hearing and render the recommendation. (*Id.*) In Plaintiff's case, Lt. Hampton and Lt. Sumlar followed this procedure, but Lt. Hampton forwarded information to Lt. Sumlar so that she could determine whether to include that information in her investigation and preparation of the *Loudermill* Notice. (*Id.*)

In Plaintiff's case, Lt. Sumlar made the decision to put together the initial *Loudermill* Notice given to Plaintiff and drafted the charges against Plaintiff. (Dep. of Lt. Hampton, D.E. #

148-1, at 31; Dep. of Lt. Sumlar, D.E. # 148-3, at 32.)  She used the documents in Plaintiff's

folder, but she did not make an independent investigation as to the accuracy of those documents.

(Dep. of Lt. Sumlar, D.E. # 148-3, at 8.)  Lt. Sumlar compiled and reviewed documents provided

by others to see if any policy violations were present.  (*Id.* at 11.)  She did not recommend

termination because putting together a *Loudermill* notice is not equivalent to recommending

termination; instead, the hearing officer hears the case and decided the facts.  (*Id.* at 18.)  Lt.

Sumlar did not know that Plaintiff had appealed her assault conviction, and at the time of her

deposition, she did not know that Plaintiff's assault conviction had been reversed on appeal and

ultimately expunged.[5]  (*Id.* at 25.)  However, Lt. Sumlar stated that the expungement would have

had no effect on the composition of Plaintiff's *Loudermill* Notice because the expungement

occurred after she compiled the Notice.  (*Id.*)  Lt. Sumlar noted that Plaintiff never provided any

official documentation regarding her notice of appeal when she notified Chief Alexander that she

was going to appeal her conviction.  (*Id.* at 26.)  Plaintiff disputes this fact and asserts that she

attached the notice of appeal.  The notice of appeal is in the record at page 55 of D.E. # 148-2.  It

was filed on May 18, 2004, before Plaintiff's *Loudermill* hearing but after Lt. Sumlar compiled

her *Loudermill* Notice.

After she determined the severity of the violations, Lt. Sumlar put Plaintiff's *Loudermill*

Notice together.  (*Id.* at 18.)  The SCDC does not obtain documents from employees during the

investigation or while the *Loudermill* notice is being put together.  (*Id.* at 37.)  Lt. Sumlar stated

---

[5]     The conviction was expunged on March 16, 2005, after Plaintiff had been
terminated.  (Dep. of Lt. Sumlar, D.E. # 148-3, at 34.)  Similarly, the order of dismissal of
Plaintiff's charges, which is Exhibit 1 to Lt. Hampton's deposition, was filed on January 14,
2005, after Plaintiff was terminated.  (*Id.* at 35.)

that she had no role in the outcome of the *Loudermill* hearing. (*Id.* at 24.) She never spoke with Lt. Hampton about Plaintiff and the allegations against her; she merely forwarded the *Loudermill* Notice to him. (*Id.*) After she gave it to Lt. Hampton, he began to review the entire Notice. (Dep. of Lt. Hampton, D.E. # 148-1, at 25.) Lt. Hampton conducted the *Loudermill* hearing and made the recommendation that Plaintiff be terminated.[6] (*Id.*)

Lt. Hampton's deposition contains an extensive discussion of the disciplinary events in Plaintiff's file. (Dep. of Lt. Hampton, D.E. # 148-1, at 35-42.) In making his recommendation, Lt. Hampton relied on several matters in Plaintiff's file which she alleges should not have been in the file. (*See id.* at 37-39.) However, Lt. Hampton does not maintain the disciplinary files for SCDC employees. (*Id.* at 42.) According to Lt. Sumlar, the SCDC maintains two different kinds of files: Shelby County files housed in a downtown office and the operation files housed at the SCDC. (Dep. of Lt. Sumlar, D.E. # 148-3, at 11.) She indicated that downtown files do not necessarily contain the same information as the operation files, as "some things do not make it downtown." (*Id.*) Discipline on a disciplinary infraction form, whether oral or written, makes it downtown. (*Id.* at 12.) Likewise, a major infraction, which would also be put in a *Loudermill* notice, makes it downtown. (*Id.*) Lt. Sumlar had no explanation as to why some documents were in Plaintiff's file that otherwise should not have been there. (*Id.* at 20.)

Additionally, Plaintiff requested that some records be removed from her file, and the requested records were not removed. (*Id.* at 38.) However, Lt. Sumlar did not receive Plaintiff's

---

[6] A factual dispute exists as to whether Plaintiff was adequately represented by counsel at her *Loudermill* hearing. Defendant contends that she was represented; Plaintiff states that her counsel was admitted to the hearing approximately thirty minutes after it had started. Such a claim implicates due process, but Plaintiff did not state a due process claim in her Third Amended Complaint.

request, and she did not know who had the responsibility to carry out the removal of the files. (*Id.*)  Neither Plaintiff, Lt. Sumlar, or Lt. Hampton pointed to other individuals who had requested removal of disciplinary records only to have those records not be removed.

## Retaliation

Lt. Hampton knew that Chenita Barten, a correctional officer and a plaintiff in the 2002 Lawsuit, stabbed her husband, but he was not aware that she violated a restraining order.  (Dep. of Hampton, D.E. # 148-1, at 49.)  She was not terminated from her job.  (*Id.*)  He did not know that she was not a plaintiff in the 2002 Lawsuit until he was provided a list of members of that group.  (*Id.* at 49-50.)  In fact, Lt. Hampton said that he did not learn which SCDC correctional officers were plaintiffs in the 2002 Lawsuit until March of 2007.  (*Id.* at 51.)

In contrast, Plaintiff stated that she was retaliated against because the SCDC used its operational file against her, and she did not have access to it.  (Dep. of Hillman, D.E. # 79, at 31.)  Moreover, she asserts that she was retaliated against because Lt. Sumlar relied upon a conviction that Plaintiff had appealed when the appeal had yet to be decided.  (*Id.*)  Additionally, Plaintiff believed that she was wrongfully written-up for violations of SCDC's policies for "assaultive type conduct" after the 2002 Lawsuit commenced.  (*Id.* at 67-68.)  She believes that some females in the 2002 Lawsuit were harassed and terminated and that some were forced to resign. (*Id.* at 30.) In her Affidavit, Plaintiff asserted as follows:

> I immediately understood why they were assisting Shirley Abrams: they were out
> to get me because of . . . my EEOC charges and the filing of the federal lawsuit.  It
> was payback time.  This was proof to me that they were retaliating against me,
> just like they fired Kathleen Ellis over what her brother had done, and like they
> forced Marilyn Cole to take early or disability retirement after harassing her for

months. Out of the group of plaintiffs, those who backed off and got quiet were later promoted.[7]

Notably, Plaintiff does not cite to any other record evidence in support of these assertions.

## Sex Discrimination

During Lt. Hampton's deposition, Plaintiff's counsel systematically questioned him about his involvement in investigating and recommending termination or retention of other SCDC correctional officers. (Dep. of Hampton, D.E. # 148-1, at 44-51.) Lt. Hampton was not involved in an investigation of Ronnie Carson and John Cannady, who got into a physical fight on the SCDC premises on February 4, 2002. (*Id.* at 44.) He did not investigate Ryan Boyd for pushing a sergeant's hand away from his chest or committing an assault on Sergeant Nelson on July 17, 2003. (*Id.* at 45.) In 2001, Janet Douglas received a letter of warning, but Lt. Hampton was not involved. (*Id.*) On January 20, 2004, Keith Arvelo and Gwen Larry, two SCDC employees, got into a physical argument, but Lt. Hampton did not investigate that. (*Id.*) Nor did Lt. Hampton investigate or get involved with Tameka Mitchell's arrest for vandalism on March 18, 2005. (*Id.*) He did not get involved in a 2002 altercation between Lavert Day and Charles Green. (*Id.* at 46.)

Similarly, Lt. Hampton was aware of Darryl Nelson's ("Nelson") March 15, 2005 arrest for simple assault and domestic violence, and he knew that Nelson received a written reprimand, but he was not involved in Nelson's investigation or the preparation of his *Loudermill* notice. (*Id.*) Lt. Hampton was not involved with Demon Lanfair's arrest for domestic violence on September 5, 2004. (*Id.*) Lt. Hampton knew about Ingrid Ingram's arrest for assault and

---

[7]     (Aff. of Hillman, D.E. # 147, at 10.)

14

vandalism, but he wasn't involved in it. (*Id.*) Ingrid Ingram was not terminated, but Lt. Hampton did not indicate that he participated in the investigation or disciplinary decision. (*Id.*) Lt. Hampton only became aware of Jackie Dunlap receiving an oral reprimand for cursing and screaming at another correctional officer after he reviewed certain documents. (*Id.* at 46-47.) Lt. Hampton did not indicate that he participated in the investigation or disciplinary decision. (*Id.*)

Lt. Hampton was aware of Larry Hunt's suspension without pay pending the disposition of his February 16, 1997 arrest for aggravated assault. (*Id.* at 47.) He neither knew about nor recalled whether he investigated James Dowell's October 10, 2005 ten-day suspension for breaking another officer's car window, but he knew that he was not terminated. (*Id.*) Lt. Hampton remembered Nathaniel Freeman's ("Freeman") arrest for DUI "or something to that effect." (*Id.* at 47-48.) Freeman was terminated for his arrest because his arrest reflected negatively on the SCDC. (*Id.* at 48.) Lt. Hampton did not say whether he was involved in the compilation of Freeman's *Loudermill* notice or the decision to terminate him. (*Id.*) However, Brian Brooks pled guilty to a DUI in 1995, but he was not fired over his conviction. (*Id.*)

Lt. Hampton did not know that Lee Norman made threats of violence against other SCDC employees, nor did he know that he was sent to Lakeside,[8] but he did know that Lee Norman was still employed at the SCDC. (*Id.*) Similarly, Lt. Hampton did not know that a kitchen employee named Brittenum threatened to blow up the SCDC or that he was told to go to Lakeside, but he did know that Brittenum had not been fired for his statements. (*Id.* at 49.) He also did not know about Michael Clark getting arrested for pulling a gun on a civilian, but he did know that Michael Clark had not been terminated. (*Id.*) Lt. Hampton was aware that Timothy Bowie had been

---

[8]        Lakeside is a psychiatric hospital in the Memphis area.

arrested, but he did not bring a *Loudermill* packet against him.  (*Id.* at 50.)  Lt. Hampton was not

aware of any discipline arising out of a domestic dispute between several correctional officers.

(*Id.*)  Furthermore, he had heard about Steven Craig's arrest for physically assaulting his sister,

but he was not involved in any *Loudermill* notice or investigation.  (*Id.* at 51.)  Steven Craig was

not terminated.  (*Id.*)  Finally, Plaintiff's counsel mentioned Larry Hunt, who was arrested for

aggravated assault and was not terminated from his job, but Lt. Hampton was not involved with

the *Loudermill* process at that time.

Lt. Hampton averred that he was not involved with "the *Loudermill* packet [or] hearing"

for any of these correctional officers.  (*Id.*)  Nor was he involved in preparing a notice of

investigation for any of the individuals in this case.  (*Id.*)

Plaintiff disputes this assertion and relies on this list of individuals to assert that other

correctional officers had been arrested and convicted and were not terminated.  (Dep. of Hillman,

D.E. # 79, at 29-30.)  Moreover, she states that she was treated differently than these other

individuals due to the inaccurate composition of her *Loudermill* Notice, which had information

in it that the SCDC should have omitted under its policies.  (*Id.*)  However, she did not argue that

Lt. Hampton was involved in deciding whether to terminate or retain the correctional officers

discussed above.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that the "court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."[9]  In reviewing a motion for summary

---

[9]        Fed. R. Civ. P. 56(a).

judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[10]

When the motion is supported by documentary proof such as depositions and affidavits, the

nonmoving party may not rest on his pleadings but instead must present some "specific facts

showing that there is a genuine issue for trial."[11]  It is not sufficient "simply [to] show that there

is some metaphysical doubt as to the material facts."[12]  These facts must be more than a scintilla

of evidence and must meet the standard of whether a reasonable juror could find by a

preponderance of the evidence that the nonmoving party is entitled to a verdict.[13]  When

determining if summary judgment is appropriate, the Court should ask "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-side that

one party must prevail as a matter of law."[14]

Summary judgment must be entered "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial."[15]  In this Circuit, "this requires the nonmoving party

to 'put up or shut up' [on] the critical issues of [his] asserted causes of action."[16]

## ANALYSIS

---

[10]     *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[11]     *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[12]     *Matsushita*, 475 U.S. at 586.

[13]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[14]     *Id*. at 251-52.

[15]     *Celotex*, 477 U.S. at 322.

[16]     *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

## Title VII and THRA Retaliation

Title VII prohibits discrimination in employment on the basis of "race, color, religion, sex, or national origin."[17]  Title VII also prohibits retaliatory discrimination against an employee "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[18]  To make out a prima facie case of retaliation under § 2000e-3(a), a plaintiff must establish that:

> (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.[19]

Because the Tennessee legislature intended the THRA to be coextensive with federal law, a retaliation claim under the THRA follows the same analysis as Title VII.[20]

As to the first prong of this test, whether the plaintiff engaged in a protected activity, the Court must first consider whether the retaliation claim is based on an allegation that the employee participated in any proceeding under Title VII (the "Participation Clause") or opposed a practice declared discriminatory under Title VII (the "Opposition Clause") to determine the

---

[17]     42 U.S.C. § 2000e-2(a)(1).

[18]     42 U.S.C. § 2000e-3(a).

[19]     *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008).

[20]     *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (quoting *Phillips v. Interstate Hotels Corp. No. L07*, 974 S.W.2d 680, 683 (Tenn. 1998)).  In *Arendale*, the plaintiff's sole additional evidence of causation was his own opinion that he was the victim of racial harassment, and this evidence was insufficient to withstand a motion for summary judgment.  *Id.* at 605 ("Conclusory allegations, supported only by Plaintiff's own opinions, cannot withstand a motion for summary judgment.").

scope of review of the employer's alleged action.[21] "The distinction between employee activities protected by the participation clause and those protected by the opposition clause is significant because federal courts have generally granted less protection for opposition than for participation in enforcement proceedings."[22] Because Plaintiff's Third Amended Complaint indicates that she was terminated in 2004 for participating in the 2002 Lawsuit, the Court will evaluate Plaintiff's Third Amended Complaint under the Participation Clause.

Additionally, cases which accept "mere temporal proximity between an employer's knowledge of the protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'"[23] When making this statement, the Supreme Court cited cases in which three- and fourth-month periods between the employer's knowledge of the protected activity and the adverse employment action were insufficient.[24] Therefore, when some time passes between the protected activity and the adverse employment action, plaintiffs are required to "couple temporal proximity with other evidence of retaliatory conduct to establish causality."[25]

If a plaintiff can establish these four elements of the prima facie case of retaliation, "the burden of production shifts to [the defendant] to articulate a legitimate, nondiscriminatory

---

[21]     *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989).

[22]     *Id.* at 1312.

[23]     *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam).

[24]     *Id.* at 273-74.

[25]     *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).

reason for the adverse action."[26]  If the defendant meets that burden of production, the plaintiff

must demonstrate by a preponderance of the evidence that the proffered reason was merely a

pretext for discrimination.[27]  There are three bases for a defendant's reason to be pretextual: (1)

it has "no basis in fact," (2) it "did not actually motivate the adverse action," or (3) it "was

insufficient to motivate the adverse action."[28]  If the plaintiff can show that the defendant's

"proffered, nondiscriminatory reason was pretextual, unlawful retaliation may be inferred and

she would be entitled to take her claim to a jury."[29]  Throughout this entire *McDonnell Douglas*

framework, the plaintiff bears the burden of persuasion.[30]  Summary judgment on retaliation

claims is appropriate where there are no genuine material facts at issue.[31]

     The Sixth Circuit has explained that a prerequisite for protection under the Participation

Clause is "the instigation of proceedings leading to the filing of a complaint or a charge,

including 'a visit to a government agency to inquire about filing a charge[.]'"[32]  The Sixth

Circuit has noted that "merely threatening to file a charge should not be construed under the

---

[26]    *Kinamore v. EPB Elec. Util.*, 92 F. App'x 197, 202 (6th Cir. 2004).

[27]    *Id.* (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 562 (6th Cir. 2000)).

[28]    *Id.*

[29]    *Id.*  (citing *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 344 (6th Cir. 1997)).

[30]    *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

[31]    *See Alexander v. Ohio State Univ. Coll. of Soc. Work*, 429 F. App'x 481, 488-91 (6th Cir. 2011).

[32]    *Booker*, 879 F.2d at 1313 (quoting *Polk v. Yellow Freight System, Inc.*, 801 F.2d 190, 200 (6th Cir. 1986)).

[P]articipation [C]lause."[33]  Importantly, if the alleged activity is considered under the Participation Clause, the law affords "exceptionally broad protections" to persons who have "participated in any manner" in Title VII proceedings.[34]

The Sixth Circuit has also held that "Title VII protects an employee's participation in an employer's internal investigation into allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge."[35]  That is, the pendency of an EEOC charge is key to triggering Title VII's Participation Clause protections: "Title VII's definition of protected activity does not include participation in an internal investigation," nor does it apply without beginning a proceeding or investigation under Title VII.[36]

At the outset, the Court notes that it is undisputed that Plaintiff participated in an activity protected by Title VII:  the 2002 Lawsuit involved a hostile work environment claim under Title VII itself.  As Plaintiff's final amended 2002 Lawsuit's EEOC charge alleged that the hostile work environment began as of March 1, 2001, the Court finds that the conduct for which Plaintiff could have been retaliated against must have occurred on or after that date. Additionally, Defendant knew about the exercise of these rights, as it was the entity being sued in the 2002 Lawsuit.  Furthermore, Plaintiff was terminated in 2004, so she suffered an adverse

---

[33]     *Id.* at 1313 n.3.

[34]     *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 582 (6th Cir. 2000) (quoting *Booker*, 879 F.2d at 1312)).

[35]     *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003).

[36]     *Davis v. Rich Prods. Corp.*, 11 F. App'x 441, 445 (6th Cir. 2001).

employment action. Accordingly, the sole remaining element of her prima facie case is causation.

In its Motion, Defendant argues that Plaintiff has not made out a prima facie case of retaliation because she has not presented sufficient evidence of causation.[37]  Additionally, it asserts that three of Plaintiff's co-plaintiffs in the 2002 Lawsuit were promoted, thereby leading to an inference that Plaintiff herself, who was not promoted, did not suffer retaliation.[38]  Finally, Defendant submits that it has presented a legitimate nondiscriminatory reason to terminate Plaintiff—namely those reasons stated in her *Loudermill* Notice—and that Plaintiff has no evidence to show that Plaintiff's reason is pretextual.[39]

In response, Plaintiff argues that she has submitted evidence sufficient to raise the inference that her participation in the 2002 Lawsuit led to her termination.[40]  Plaintiff argues that she filed an internal complaint in 1997 for sexual harassment, and this internal complaint also contributed to her termination.[41]  Furthermore, Plaintiff points to the increase in the number of disciplinary complaints against her in 1998, after she filed her internal complaint, as proof that "the pretextual activity was the likely reason for the adverse action."[42]

---

[37]     (Def.'s Mot., D.E. # 141-3, at 7.)

[38]     (*Id.*)

[39]     (*Id.* at 7-8.)

[40]     (Pl.'s Resp., D.E. # 146-1, at 12.)

[41]     (*Id.* at 13-14.)

[42]     (*Id.* at 14-15.)

In reply, Defendant points out that Plaintiff does not state that she filed an EEOC charge for the 1997 sexual harassment.[43]  As such, Defendant implies that it would be contrary to law for the Court to rely on alleged retaliation for this 1997 internal sexual harassment complaint in its evaluation of the case at bar, as Plaintiff filed this lawsuit long after the 1997 harassment and her EEOC charge for this case did not allege prohibited conduct occurring before 2001.[44] Additionally, Defendant asserts that, in this case, Plaintiff cannot state a separate retaliation claim or attempt to include retaliatory actions taking place before she filed suit with the EEOC in 2004.[45]

The Court must address Plaintiff's implicit argument that her protected conduct extends as far back as 1997 based on her internal allegations of sexual harassment.  Plaintiff's argument is contrary to Sixth Circuit precedent as Plaintiff did not engage in any proceeding under Title VII until she and her coworkers commenced the 2002 Lawsuit.  Filing a complaint with the SCDC's EOC[46] is insufficient to trigger Title VII's protection.  Accordingly, the Court's evaluation of Defendant's alleged retaliation against Plaintiff will begin with the filing of the 2002 Lawsuit, and the Court will not consider Plaintiff's internal 1997-1998 complaint in its analysis.

_____

[43]     (Def.'s Reply, D.E. # 160, at 2.)

[44]     (*Id.*)

[45]     (*Id.*)

[46]     Plaintiff does not explain the meaning of this acronym when she states that "[i]n late 1997, [Plaintiff] made an internal EOC complaint to the [SCDC's] Human Resources Department, alleging that she was being sexually harassed by Sgt. Melvin Brown."  (Pl.'s Resp., D.E. # 146-1, at 2.)

The Court finds that Plaintiff has failed to present evidence sufficient to meet her burden regarding causation. Plaintiff was terminated two years after the 2002 Lawsuit began; as such, she had to present some sort of evidence linking her termination to the filing of the 2002 Lawsuit. Plaintiff has failed to do so. Lt. Sumlar, who prepared her *Loudermill* Notice, did not know the exact date that she became aware of the 2002 Lawsuit, but she knew she must have learned of it when she attended Plaintiff's deposition. Plaintiff has not presented evidence pinpointing this date; therefore, the Court is uncertain exactly when Lt. Sumlar learned of the 2002 Lawsuit. Even if the Court were to infer that Lt. Sumlar knew of Plaintiff's involvement in the 2002 Lawsuit when she compiled the *Loudermill* Notice, this mere knowledge, without more, would be insufficient to satisfy Plaintiff's causation burden. Plaintiff has not submitted evidence that Lt. Sumlar did not follow SCDC policies and procedures or that she intentionally included disciplinary matters in the *Loudermill* Notice that were not to be included under Defendant's policies and procedures. Nor was Lt. Sumlar responsible for maintaining Plaintiff's file; as such, she was not responsible for the inclusion of the materials Plaintiff alleges do not belong in her file. Thus, Plaintiff has not presented evidence connecting Lt. Sumlar's compilation of the *Loudermill* Notice and inclusion of impermissible materials regarding her participation in the 2002 Lawsuit.

Similarly, Lt. Hampton, who recommended that Plaintiff be terminated, did not know of the 2002 Lawsuit when he made his recommendation. Plaintiff has not submitted evidence to the contrary. Chief Alexander merely affirmed Lt. Hampton's recommendation, and Plaintiff has not submitted evidence demonstrating that he knew of the 2002 Lawsuit, let alone that the 2002 Lawsuit motivated him to fire her. Plaintiff's assertion that she was retaliated against

because of her involvement in the 2002 Lawsuit is insufficient to create a genuine issue of material fact as to causation; she did not cite to any evidence in the record, and her unsupported opinion does not create an issue of fact as to causation.  Accordingly, the Court finds that Plaintiff has failed to satisfy the fourth element of her prima facie case, and Defendant's Motion for Summary Judgment on Plaintiff's retaliation claims is **GRANTED**.

## THRA Sex Discrimination

The THRA prohibits discrimination in employment on the basis of "race, creed, color, religion, sex, age, or national origin."[47]  Tennessee courts have noted that "[t]he same general analytical framework and allocation of the burden of proof is used for claims under both federal and Tennessee statutes, irrespective of whether the claim asserts discrimination on the basis of race, age, sex, or any other class protected under the [THRA]."[48]  Although a sex discrimination plaintiff can prove his or her case with direct or circumstantial evidence, if the plaintiff has no direct evidence of discrimination, courts analyze his or her claims under the *McDonnell Douglas* burden shifting analysis.[49]

Here, Plaintiff has no direct evidence of sex discrimination; as such, the Court will engage in the *McDonnell Douglas* analysis.  As discussed above, the plaintiff first has the burden of providing evidence of a prima facie case of discrimination.[50]  A prima facie case of

---

[47]     Tenn. Code Ann. § 4-21-101(a).

[48]     *Bundy v. First Tennessee Nat'l Bank*, 266 S.W.3d 410, 416 (Tenn. Ct. App. 2007).

[49]     *Id.*

[50]     *Versa v. Policy Studies, Inc.*, 45 S.W.3d 575, 580 (Tenn. Ct. App. 2000).

sex discrimination under the THRA contains four elements: (1) membership in the protected

class; (2) that the plaintiff was qualified for the position; (3) that the plaintiff was terminated;

and (4) either that the plaintiff was replaced by a person outside the protected class or that a

comparable non-protected person was treated better.[51]  Next, the burden of production shifts to

the defendant to articulate a legitimate, non-discriminatory reason for its actions.[52]  Finally, the

plaintiff has the opportunity to prove that the defendant's allegedly non-discriminatory reason

was a mere pretext for discrimination.[53]

For employees to be similarly situated in the employment disciplinary context, a plaintiff

need not demonstrate an exact correlation with the employee receiving more favorable treatment

for the two to be considered similarly situated.[54]  Instead, they must be similar in all relevant

aspects.[55]  For example, Tennessee courts have noted that employees with substantially different

job title or duties are not similarly situated for THRA purposes.[56]  Additionally, they must have

dealt with the same supervisor.[57]

---

[51]     *Bundy*, 266 S.W.3d at 417.

[52]     *Versa*, 45 S.W.3d at 580.

[53]     *Id.*

[54]     *Hartman v. Tenn. Bd. of Regents*, No. M2010-02084-COA-R3-CV, 2011 WL 3849848, at *8 (Tenn. Ct. App. Aug. 31, 2011).

[55]     *Id.* (citing *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

[56]     *See, e.g.*, *id.*

[57]     *Chelton v. Provident Cos., Inc.*, No. E2002-2282-COA-R3-CV, 2003 WL 21458585, at *9 (Tenn. Ct. App. June 19, 2003).

It is undisputed that Plaintiff satisfies the first element of her prima facie case, as she is a female and is thus traditionally protected from gender discrimination. Second, she appears to have been qualified for her position as a correctional officer. In any case, Defendant has made no arguments to the contrary. Third, she was terminated from her employment with the SCDC. Thus, the Court finds that Plaintiff has established the first three elements of her prima facie case.

Although Defendant does not dispute that Plaintiff has satisfied the first three elements of her prima facie case, it alleges that she has not shown that she was treated differently from any similarly-situated, non-protected male employees.[58] Additionally, Defendant argues that even if Plaintiff could satisfy a prima facie case, she would be unable to demonstrate pretext, as she "has no evidence that [Defendant] did not 'honestly believe' in its proffered non-discriminatory reasons for its decision to terminate her."[59]

In response, Plaintiff points to the list of individuals discussed in Lt. Hampton's deposition testimony who "committed criminal acts, several of which were of a violent nature," and the fact that they were not terminated by Lt. Sumlar and Hampton as proof that Plaintiff was treated differently than other similarly situated employees.[60]

In reply, Defendant argues that Plaintiff's failure to file an EEOC charge for retaliation in 1997-1998 prevents her from stating a claim upon which relief can be granted for any

---

[58]     (Def.'s Mot., D.E. # 141-3, at 9.)

[59]     (*Id.* at 10.)

[60]     (Pl.'s Resp., D.E. # 146-1, at 17.)

retaliation arising from the 1997 sexual harassment.[61]  Additionally, Defendant submits that for

Plaintiff and the individuals she identified in Lt. Hampton's deposition to be similarly situated,

they would have had to deal with the same supervisor, be subject to the same standards, and be

engaged in the same conduct without differentiating or mitigating circumstances.[62]  Thus,

Defendant argues that Plaintiff presented no evidence to establish that Lt. Hampton terminated

any SCDC employees who were "convicted of a criminal offense based on the same events

giving rise to the internal [SCDC] charges against the employee."[63]  It also contends that

employees evaluated by other supervisors would not be similarly situated for purposes of

establishing a prima facie case.[64]

Here, the Court finds that Plaintiff has failed to meet her burden regarding the fourth

element of her prima facie case: she has not shown that she is similarly situated to the other

SCDC employees who were arrested and not fired.  Rather than relying on Defendant's

argument that Plaintiff's case presented a unique factual situation, the Court finds that Plaintiff

is not similarly situated to other arrested, non-terminated employees because Lt. Hampton was

not involved in recommending that those other employees be terminated or retained.  Although

Plaintiff presented a list of SCDC employees who were arrested for various crimes or performed

violent acts and were not terminated, Lt. Hampton did not testify that he was involved in the

---

[61]    (Def.'s Reply, D.E. # 160, at 2.)  The Court agrees, and as discussed above, it will limit is evaluation of Plaintiff's sex discrimination claim to dates contained in her EEOC charge.

[62]    (*Id.* at 5.)

[63]    (*Id.* at 6.)

[64]    (*Id.* at 7.)

decision not to terminate them.  He did not indicate that he was the decision maker for any of the other employees identified by Plaintiff; indeed, he was not aware of the majority of the employees' arrests and subsequent retentions. Although he testified that he was aware of some of the decisions not to terminate the arrested employees, his mere awareness does not indicate that he made or played a role in the decision not to terminate them.

Furthermore, Plaintiff's counsel did not question Lt. Sumlar about these individuals; rather, she merely asked her whether she was "aware of officers being convicted of misdemeanors and nevertheless retaining their jobs."[65]  Although Lt. Sumlar was aware of these officers, she did not indicate, and Plaintiff did not ask her, whether she was involved in the preparation of their *Loudermill* notices or whether any such notice was prepared.  Accordingly, the Court finds that Plaintiff has failed to meet her burden as to the fourth element of her prima facie case of sex discrimination.  She has not shown that she is similarly situated to any other correctional officers who were retained after being arrested because her decision-maker and her *Loudermill* Notice compiler differed from that of the other employees.  Therefore, Defendant's Motion for summary judgment is **GRANTED** in this regard.

## CONCLUSION

For the reasons set forth above, Defendant's Motion is **GRANTED**.

**IT IS SO ORDERED.**

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 23, 2012.

---

[65]     (Dep. of Lt. Sumlar, D.E. # 148-3, at 33.)